
CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

DEC 2 8 2006 C'Ville

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| DEAN M. INMAN, | CIVIL NO. 3:06cv00011 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| KLÖCKNER-PENTAPLAST OF AMERICA, INC., and THE KLÖCKNER PENTAPLAST GROUP, and KLÖCKNER PENTAPLAST PARTICIPATIONS S.À.R.L., | JUDGE NORMAN K. MOON |
| *Defendants* | |

This matter is before the Court on a motion to dismiss filed by Defendants Klöckner Pentaplast of America, Inc. and Klöckner Pentaplast Participations S.À.R.L. on June 5, 2006 (docket entry no. 18). For the following reasons, Defendants' Motion to Dismiss will be GRANTED in an order to follow, but Plaintiff will be given leave to amend his second amended complaint with respect to his ERISA claim only.

## I. BACKGROUND

### *A. Factual background*

This action arises as a result of Defendant Klöckner Pentaplast of America, Inc. ("KPA") terminating the employment of Plaintiff Dean Inman ("Plaintiff"). The allegations as set forth in the second amended complaint are as follows.

KPA hired Plaintiff in 1988 when Plaintiff was 41 years old. Plaintiff's employment was not subject to a formal, express contract until December 1997. Under the terms of the express

1

contract, each party was required to give either six or twelve months' notice of his intent to terminate the contract. The contract stated that Plaintiff's employment would terminate when Plaintiff turned 65 years old.

KPA is part of a group known colloquially as "Klöckner Pentaplast Group" ("KPG").[1] In early 2002, third-party financial investors purchased KPG with the expectation of selling it four to five years later at a profit. Also in early 2002, and as part of an employee incentive program, KPG established Klöckner Pentaplast Participations S.À.R.L. ("KPP") as a holding company in which KPG managers were selectively invited to invest. The hope was that the investors, as KPG managers, would have an incentive to increase the value of KPG before the third-party investors sold it.

Plaintiff purchased $32,700 worth of KPP stock in February 2003. At the time he bought the stock, KPA provided him with a stock overview or model that estimated that the value of the stock he purchased would be worth between $1 million and $1.5 million by 2006 or 2007, the estimated year that KPG would be sold. Plaintiff considered his stock ownership to be a "suitable compensation alternative" to his salary, which he felt was below average. (*See* Second Am. Compl. ¶ 24)

KPA subsequently hired outside consultants to assist it in improving KPA's image and in improving KPA's efficiency in order to make it more attractive to potential buyers. Plaintiff alleges that during a meeting with one of these consultants and with Plaintiff's supervisor, Mike Tubridy ("Tubridy"), Tubridy told Plaintiff that the latter had little potential for advancement within the company compared to the potential of younger engineers. Plaintiff was also allegedly

---

[1] The Court notes that KPG was originally a named defendant in this action. In his second amended complaint, however, Plaintiff has deleted all mention of KPG. It is unclear at this time whether KPG is a proper defendant in this action; it does not appear that KPG, if it exists, has been served with process.

told that KPA wanted to develop "new talent" instead of "enhancing and optimizing" the skills of older workers. Additionally, Plaintiff alleges, KPA's director of human resources told Plaintiff that he was "getting up there in years."

In preparation for the sale of KPA, Plaintiff developed a business plan that he presented to several superiors, including Tubridy. Tubridy allegedly told Plaintiff that the plan was something he would expect from Plaintiff "as a part of the old group" and the conversation turned to ideas from "new people."

Plaintiff, who had been the vice president of technology for KPA since approximately 1996, was fired on December 15, 2005. Plaintiff claims he had never received any formal indication that his job was in jeopardy; in fact, Plaintiff claims he was never placed on probation, had never been disciplined, and had never been warned of a deficiency in work performance. Tubridy allegedly told Plaintiff that the latter did not fit the profile of a technical leader in a company that was up for sale. According to Plaintiff, Tubridy said that KPA needed someone in Plaintiff's position "who would depict a more energetic person" in keeping with KPA's desire to appear to be a revitalized company.

Defendants claim that because Plaintiff's employment contract calls for him to sell his stock in KPP to Defendants upon termination,[2] KPA sent a check to Plaintiff at the end of December 2005 for $41,100, evidently representing the value of Plaintiff's stock. Plaintiff has since refused to cash the check because the amount KPA has offered is a fraction of what Plaintiff believes the stock to be worth. KPA sent Plaintiff a letter in late February 2006

---

[2] Plaintiff concedes this point despite the fact that the employment contract provided by Plaintiff does not address this arrangement. (*See* Second Am. Compl. ¶ 43 ("According to a clause in Inman's employment contract, he is required to sell his ownership in the company back to KPA upon his termination."))

3

demanding that he sell back his shares of KPP stock for the $41,100 lest KPP divest Plaintiff of the stock. This action followed.

### B. Procedural background

Plaintiff originally filed suit in this Court in March 2006, but amended his complaint for the first time in April 2006. Defendants KPA and KPP then moved to dismiss under Rule 12(b)(6). In late June 2006, Plaintiff moved to amend his amended complaint and attached a proposed second amended complaint as part of his memorandum in support of that motion. Magistrate Judge B. Waugh Crigler granted Plaintiff's motion to amend his amended complaint ("Second Amended Complaint") on August 23, 2006, and thereby deemed Defendants' motion to dismiss and all briefs in support thereof and opposition thereto amended with respect to Plaintiff's second amended complaint.

In his second amended complaint, Plaintiff seeks recovery under several causes of action: age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (Count I); interference with a benefit plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 (Count II); a declaratory judgment that Plaintiff is not required to sell his stock to Defendants, that Defendants acted unlawfully by demanding that Plaintiff sell his stock to them, and that Defendants acted unlawfully by terminating Plaintiff's employment "so as to avoid paying him the benefits he had earned as an employee" (Count III); breach of contract (Count IV); civil conspiracy under Virginia Code § 18.2-500 (Count V); conversion under Virginia Code § 8.3A-420 (Count VI); and unjust enrichment under Virginia common law (Count VII).

Defendants have moved to dismiss Counts II, IV, V, VI, and VII.

4

## II. MOTION TO DISMISS

### *A. Standard of Review*

Defendants argue that Plaintiff's complaint fails to state a claim upon which relief can be granted with respect to five of Plaintiff's claims and therefore moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999).

In considering a Rule 12(b)(6) motion, a court must accept all allegations in the complaint as true, must draw all reasonable inferences in favor of the plaintiff, and should not dismiss unless the defendant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim" that would allow the plaintiff relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244; *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254-55 (W.D. Va. 2001). Stated differently, a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

*Swierkiewicz* involved a plaintiff who alleged that the defendant discriminated against him by terminating his employment because of his national origin (in violation of Title VII) and because of his age (in violation of the ADEA). His complaint detailed the events leading to his termination and included relevant dates and the ages and nationalities of other employees. The Supreme Court held that to survive a Rule 12(b)(6) motion to dismiss plaintiff's discrimination claim, the plaintiff was not required to include in his complaint allegations supporting each element of a prima facie case of discrimination under the *McDonnell Douglas* framework.

5

The Supreme Court based this holding on several rationales. First, the Court stated that a prima facie case under the *McDonnell Douglas* framework was an evidentiary standard, not a pleading requirement. *See Swierkiewicz*, 534 U.S. at 510–511 (stating that requiring greater particularity would "too narrowly constrict the role of the pleadings"). Second, to hold otherwise amounted a "heightened pleading standard" that would conflict with Rule 8(a)(2)'s low requirement that a plaintiff only provide a short and plain statement of the claim showing he is entitled to relief. *Id.* at 511 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and stating that Rule 8(a)(2) need only give a defendant fair notice of the plaintiff's claim and the grounds on which it rests). Third, employment discrimination claims are not subject to Rule 9(b)'s requirement of greater particularity. *Id.* at 513.

Fourth, other rules support Rule 8(a)'s "simplified notice pleading standard," including Rule 8(e)(1)'s statement that no technical forms of pleading are required; Rule 8(f)'s statement that all pleadings should be construed to do substantial justice; and Rule 84 in conjunction with Form 9, which indicates the "simplicity and brevity of statement which the rules contemplate." *Id.* at 513–14 & n.4. Fifth, the Court disagreed with the defendant's argument that allowing plaintiffs to hurdle 12(b)(6) motions with complaints containing "conclusory allegations of discrimination" would open the proverbial floodgates and would "encourage disgruntled employees to bring unsubstantiated suits." *Id.* The Court again stated that the federal rules do not require "a heightened pleading standard" for employment discrimination suits; requiring greater specificity would require amending the rules.

The Fourth Circuit has held, however, that *Swierkiewicz* did not eviscerate the requirement that, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff allege facts sufficiently enough to allow the reviewing court to infer that every element of the cause of action exists. *See*

6

*Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002) (upholding dismissal of the automobile crash victim plaintiffs' claim against hospital for negligent dispensing of drugs, in part, because the complaint failed to allege that the hospital knew or should have known at the time it dispensed drugs that the driver-patient was both already under the influence of drugs and would likely drive an automobile soon thereafter and stating that "[e]ven in these days of notice pleadings, a complaint asserting a negligence claim must disclose that each of the elements is present in order to be sufficient" (internal citations and quotation marks omitted)); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) (embracing *Iodice* and stating that *Swierkiewicz* "did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim"); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Iodice* and *Dickson*, stating that the Fourth Circuit "has not, however, interpreted *Swierkiewicz* as removing the burden of a plaintiff to allege facts sufficient to state all the elements of her claim," and concluding that although "a plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff *is* required to allege facts that support a claim for relief"); *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 347–48 (4th Cir. 2005) (discussing *Iodice*, *Dickson*, and *Bass* and concluding that the Fourth Circuit's requirement for a complaint to survive a Rule 12(b)(6) motion is "not onerous" but instead meets Rule 8's requirements if "in light of the nature of the action, the complaint sufficiently alleges each element of the cause of action so as to inform the opposing party of the claim and its general basis"); *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344–45 (4th Cir. 2006) (discussing *Swierkiewicz*, *Bass*, and *Dickson* and reaching the same conclusion as in the latter cases), *reh'g en banc denied*, 467 F.3d 378 (4th Cir. 2006).

Some district courts in the Fourth Circuit have followed *Swierkiewicz. See, e.g., Cockerham ex rel. Cockerham v. Stokes County Bd. of Educ.*, 302 F. Supp. 2d 490, 496 (M.D.N.C. 2004) (collecting cases). Others, however, have followed the *Jordan-Bass-Dickson-Iodice* line of cases. *See, e.g., Signal v. Gonzales*, 430 F. Supp. 2d 528, 538 & n.3 (D.S.C. 2006); *Hoffman v. Balt. Police Dep't*, 379 F. Supp. 2d 778, 792 n.12 (D. Md. 2005); *Cockerham*, 302 F. Supp. 2d at 494, 495 (M.D.N.C. 2004).[3]

This Court will endeavor to follow the Fourth Circuit's post-*Swierkiewicz* holdings. As such, plaintiffs must sufficiently allege facts to allow the Court to infer that all elements of each of his causes of action exist.

With that in mind, the Court now turns to a discussion of the causes of action Defendants seek to have dismissed.

### B. Discussion: Count II (ERISA)

Plaintiff alleges that Defendant KPA terminated him, in part, in order to prevent him from realizing the benefits of the sale of KPG and the appreciation of his stock investment, a violation, Plaintiff says, of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1140 (West 2006).

Defendant argues that Plaintiff's stock purchase was not an ERISA plan and, therefore, should be dismissed.

There are two arguments supporting Plaintiff's assertion that his complaint should survive Defendants' motion: (1) it is enough, without more, for Plaintiff to merely allege that his purchase of Defendants' stock constitutes an ERISA plan and (2) the allegations in Plaintiff's

---

[3] For scholarly commentary on these seemingly different pleading requirements, see Christopher M. Fairman, *The Myth of Notice Pleading*, 45 Ariz. L. Rev. 987 (2003); Koan Mercer, Note, *"Even in These Days of Notice Pleadings": Factual Pleading Requirements in the Fourth Circuit*, 82 N.C. L. Rev. 1167 (2004).

8

complaint allow the Court to infer that such a plan actually exists. The Court finds neither argument persuasive.

Plaintiff states, in his second amended complaint, that "[t]he offer to invest in Defendants or either of them constitutes a 'plan' as defined in 29 U.S.C. § 1002(3)" (Pl.'s Second Am. Compl. ¶ 59) and that "KPP terminated [Plaintiff], at least in part, so as to prevent [Plaintiff] from realizing the benefits of the upcoming sale ... and the appreciation of [Plaintiff's] stock investment" (Pl.'s Second Am. Compl. ¶ 61) Plaintiff argues that "it is sufficient at this stage that [Plaintiff] simply state that he is a participant in an employee retirement benefit plan" because "[t]his allegation must be taken as true." (Pl.'s Opp'n to Defs.' Joint Mot. to Dismiss 6)

Plaintiff points to *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254–55 (W.D. Va. 2001), for the proposition that if the allegations in his complaint provide a more-than-sufficient basis from which the Court can infer that all of the required elements of his claim are present, then his claim should not be dismissed. Although this is certainly true, *Warner* is inapposite to Plaintiff's argument. In *Warner*, there were allegations in the complaint that gave the court a basis from which it could infer that all of the elements were present. What Plaintiff is attempting to do here, however, is to persuade the Court that, by merely stating such a plan exists, it must be so.

In the Court's opinion, such a conclusion would likely suffice for the complaint to survive Defendants' motion to dismiss under *Swierkiewicz* for two reasons. First, in such a situation, Plaintiff's complaint would meet the low threshold required by the Federal Rules and by *Swierkiewicz*: it must first put the defendants on notice of his claim and must second set forth the grounds on which that claim rests. Here, the complaint puts Defendants on notice of his claim (violation of ERISA) and provides the basis for such a claim (that he was fired, in part, to

9

prevent him from realizing the benefits of a stock investment program that he says qualifies as an ERISA plan).

Second, it is conceivable that there exists a set of facts that Plaintiff could eventually prove that would show that the stock investment plan was, in fact, an ERISA plan. *See, e.g.*, *Swierkiewicz*, 534 U.S. at 514 ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Plaintiff could, hypothetically, show up in court after discovery and point to documents proving that the stock investment program initiated by Defendants constituted an ERISA plan. More precisely, the Court cannot conclude that there is *no* possible chance that Plaintiff could not show as much. Because this is so, such a complaint would likely survive analysis under *Swierkiewicz* and *Conley*. *See Swierkiewicz*, 534 U.S. at 514; *Conley*, 355 U.S. at 45–46; *see also* Koan Mercer, Note, *"Even in These Days of Notice Pleadings": Factual Pleading Requirements in the Fourth Circuit*, 82 N.C. L. Rev. 1167, 1177 (2004) (stating that under Supreme Court precedent and under the Federal Rules, "a plaintiff need only meet two modest conditions to survive a Rule 12(b)(6) motion: his complaint must give the defendant fair notice of the nature and grounds of [the] claim against him, and there must exist the possibility of some set of facts that could be proved consistent with the plaintiff's allegations upon which relief could be granted").

The problem with Plaintiff's argument, however, is that Plaintiff has not merely asserted that an ERISA plan exists by virtue of his investment in Defendants. Instead, Plaintiff has

10

included other allegations in his complaint that make it far less likely that this investment constituted an ERISA plan. *See* discussion *infra* (concluding that based solely on the allegations in Plaintiff's complaint, his investing in Defendants does not constitute an ERISA plan). Plaintiff alleges that his employment contract contained a clause stipulating that he would retire at age 65, which would be sometime prior to July 2012.[4] Sometime in early 2002, Plaintiff "was offered the opportunity to invest in the company" (Second Am. Compl. ¶ 19) at about the same time third-party investors purchased the company, (Second Am. Compl. ¶ 20). "It was common knowledge" that the third-party investors intended to sell the company within four to five years; therefore, "[t]he stock was offered to Inman as a means through which he could substantially participate in the success of the company as well as the profit expected from its sale." (Second Am. Compl. ¶ 20) Inman purchased $32,700 worth of stock and expected, based on an investment model given to him, that the stock would appreciate to between $1 million and $1.5 million by 2006 or 2007. (*See* Second Am. Compl. ¶¶ 21, 23) He also considered this stock ownership to be supplemental to what he thought was his below-average salary. (Second Am. Compl. ¶ 24) A provision in his employment contract required Inman to sell his stock back to the defendants upon his termination. (Second Am. Compl. ¶ 43)

After incorporating these allegations into his ERISA claim, Plaintiff states that this "offer to invest in Defendants or either of them constitutes a 'plan' as defined ... under ERISA." (Second Am. Compl. ¶ 59).

With these allegations in mind, it is still likely that in a *Swierkiewicz* regime, a court would allow this complaint to survive a motion to dismiss. The Defendants are still on notice of Plaintiff's claim (violation of ERISA) and the grounds on which that claim is based (that

---

[4] Based on other allegations in the complaint, Plaintiff was 41 years old in July 1988; he would therefore be 65 years old by July 2012.

Defendants fired Plaintiff, in part, to prevent him from realizing the benefits of the stock investment program). Additionally, it is still conceivable that there exists a set of facts that (1) Plaintiff could eventually prove that would show that the stock investment plan was, in fact, an ERISA plan and (2) that such facts would not contradict the allegations in his complaint.

Because, however, the Court is bound by Fourth Circuit cases decided after *Swierkiewicz* that interpret that opinion, *see* discussion *supra*, the Court cannot merely accept Plaintiff's conclusion that an ERISA plan exists and must examine the complaint closely to determine whether the allegations relating to the stock investment program actually allow the Court to infer than an ERISA plan exists. *See Jordan v. Alternative Res. Corp.*, 458 F.3d 332 (4th Cir. 2006), *reh'g en banc denied*, 467 F.3d 378 (4th Cir. 2006); *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342 (4th Cir. 2005); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003); *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270 (4th Cir. 2002).

Additionally, the Court notes that *Jordan* is especially persuasive here: as the Fourth Circuit stated there, courts should be especially leery of allowing complaints to survive motions to dismiss in situations in which the plaintiff alleges one thing in conclusory terms, but the complaint also alleges certain things that seem to give rise to the opposite inference. *See Jordan*, 458 F.3d at 345 (rejecting reliance on conclusory allegations in a complaint "particularly when the plaintiff ... has purported to set forth in detail the facts upon which his claims are based"); *see also* 5B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1357 (3d ed. 1997) (collecting cases and stating that "the district judge will accept the pleader's description of what happened to him or her along with any conclusions that can reasonably be drawn therefrom" but that "the court will not accept conclusory allegations concerning the legal effect of the events the

12

plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself"). The Court must therefore examine the allegations that Plaintiff has actually asserted in order to determine whether it can infer that an ERISA plan exists.

The facts as Plaintiff alleges them that are before the Court belie the existence of an ERISA plan, as will be shown below, and the Court cannot infer — on the allegations currently before it — that an ERISA plan exists. The Court must therefore grant Defendants' motion with respect to Plaintiff's ERISA claim.

ERISA allows, among other things, a civil litigant to recover for an employer's interference with protected rights. More specifically, 29 U.S.C. § 1140 makes it "unlawful for any person to discharge, … discipline, or discriminate against a participant or beneficiary for" either (1) "exercising any right to which he is entitled under the provisions of an employee benefit plan" or other (here, irrelevant) provisions or (2) "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan" or under other (here, irrelevant) provisions. *See* 29 U.S.C. § 1140 (2000). A person who violates § 1140 can be sued pursuant to § 1132. *See id.* ("The provisions of section 1132 of this title shall be applicable in the enforcement of this section.").

ERISA only applies if a "plan" is involved. *See, e.g., id.* § 1101(a) (West 2006) ("This part shall apply to any [non-exempt] employee benefit plan described in section 1003(a) … other than … a plan [that] is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."). ERISA defines "employee benefit plan" or "plan" to mean one of three things: "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an

13

employee welfare benefit plan and an employee pension benefit plan." *See id.* § 1002(3).

Plaintiff's allegations would require the Court, then, to infer that his stock purchase plan constitutes either an ERISA welfare plan or an ERISA pension plan. The former requires that Defendants establish or maintain a program for the purpose of providing certain statutorily defined benefits, *see* 29 U.S.C. § 1002(1) (2000),[5] and the latter requires that Defendants establish or maintain a program that, expressly or as a result of surrounding circumstances, either "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond," *see id.* § 1002(2)(A).[6]

Holdings in several cases, however, make clear that the plan at issue here — as currently alleged by Plaintiff — is not an ERISA plan.

In *Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980), the defendant employer gave bonuses to select employees by — on behalf of those employees — assigning an interest in a drilling prospect to a third party to administer the interest. *Id.* at 572. An employee's interest was based on that employee's contribution to the company, his tenure, and his classification; after

---

[5] Section 1002(1) defines a "employee welfare benefit plan" (or "welfare plan") to mean:
    any plan, fund, or program which was ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
29 U.S.C. § 1002(1) (2000).

[6] Section 1002(2)(A) defines a "employee pension benefit plan" (or "pension plan") to mean:
    any plan, fund, or program which was ... established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program —
        (i) provides retirement income to employees, or
        (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
    regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
29 U.S.C. § 1002(2)(A) (2000).

14

retirement, the employee continued to own the interest. *Id.* at 572–73. But if the employee left the defendant's employ for reasons other than death, disability, or retirement, the employee was divested of the interest. *Id.* at 573 n.3.

The Fifth Circuit held that this was not an ERISA plan because the bonuses were discretionary, resulted from the employee's special service, and were awarded in addition to an employee's regular compensation. *See id.* at 574. Specifically, this could not be deemed a welfare plan merely because the payments could continue after the employee died or became disabled. *See id.* "It is evident that the primary purpose of the [agreement] was to reward employees for their service with present benefits." *Id.*

Similarly, the stock purchase plan at issue here was, as both parties have described it, designed for current employees to give themselves an incentive to increase the profitability of KPG over the coming few years so that it could be sold at a profit. The mere fact that Plaintiff could choose to hold on to his stock until after KPG was sold and until, perhaps, after Plaintiff died or became disabled (statutory benefits under 29 U.S.C. § 1002(1)), does not render it an ERISA plan. The stock purchase plan was not established or maintained for the purpose of providing death or disability benefits.

Additionally, the Fifth Circuit could not characterize the bonus plan as an ERISA pension plan. First, the court noted that the definition of a pension plan is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Id.* at 575. The plan there did not "provide retirement income" merely because an employee could receive income after retirement. After all, the court said, "[a]ny outright conveyance of property to an employee might result in some payment to him after retirement." *Id.* Second, the plan did not qualify because it did not result in an income deferral.

15

Here, too, although it is possible that Plaintiff could see income from his stock investment after the time he retired, that fact alone does not render the KPP stock purchase an ERISA plan. Additionally, the Court notes that there is not even a guarantee that Plaintiff will, in fact, have "income" from the sale of the stock. It is possible that Plaintiff could take a *loss* if the stock price goes down.

More recently, the Third Circuit, relying in part on *Murphy*, held in *Oatway v. American International Group, Inc.*, 325 F.3d 184 (3d. Cir. 2003), that the defendant employer's issuance of stock options to certain employees as a work incentive was not a plan covered by ERISA. The court held that such an arrangement could not be a welfare plan because it was "not designed specifically to provide employees with" the benefits listed in § 1002(1). *Id.* at 188–89. And the plan could not be a pension plan because "it was not created for the purpose of providing retirement income, but rather was an incentive plan designed to provide a financial incentive for employees to remain with [the defendant] and improve their performance there." *Id.* at 189. Any "post-retirement payments were only incidental to the goal of providing current compensation" and such an arrangement was not a deferral of income "even though [the options] could be exercised after [the plaintiff] retired." *Id.*

The similarity of *Oatway* to this case is obvious: the stock purchase plan Plaintiff describes was not designed to provide employees like him with benefits listed in the ERISA statute. (*See, e.g.*, Second Am. Compl. ¶ 20 (stating that the "stock was offered to Inman as a means through which he could substantially participate in the success of the company as well as the profit expected from its sale"))

There is an additional point that may not be obvious, but that also cuts against Plaintiff. In *Oatway*, the court held that the stock options given to employees to purchase stock at a later

time — a relatively safe "investment" — did not constitute an ERISA plan. If the plaintiff's stock in *Oatway* appreciated, he would certainly exercise his option and see actual income; if, however, the stock depreciated, he could just decline to exercise his purchase option and not lose any money. Here, the stock purchase plan is far more risky. Plaintiff *actually* purchased the stock with the hope that its value would appreciate. The safety valve in *Oatway* is not present for Plaintiff here — it is possible that Plaintiff could incur a loss should his stock price actually depreciate. One would think that if an employer were interested in establishing or maintaining a program for the purpose of providing its employees medical, hospital, sickness, accident, disability, death, or unemployment benefits, it would ensure that the program would resemble the safe stock option plan in *Oatway*.

In *Hagel v. United Land Co.*, 759 F. Supp. 1199 (E.D. Va. 1991), the court rejected the plaintiff's argument that bonuses he received, which were paid out in five annual installments, constituted an ERISA pension plan because "some portion" of his income could "happen[] to become due" after plaintiff resigned. *Id.* at 1202. Importantly, the bonus plan was also not a welfare plan because it was not established for the purpose of providing the statutory benefits. "[T]he objective of the agreement was not disability compensation; it was instead designed to provide a financial incentive for plaintiff to improve his performance while employed" by the defendant. *Id.* at 1203. "Thus," the court continued, "the agreement on its face shows that its purpose did not encompass disability or death payments. There is no guarantee that plaintiff or his beneficiaries would receive any payments under the agreement if plaintiff were disabled or killed." *Id.*

Just as in *Hagel*, where "the agreement specifically provided that in the event of net losses on development projects, plaintiff would receive no payments," *id.* at 1203–04, Plaintiff

17

here "would receive no payments" should the value of his KPP stock decrease, whether due to Plaintiff's job performance or otherwise.

Finally, in *Roderick v. Mazzetti*, No. C04-2436, 2004 WL 2554453 (N.D. Cal. Nov. 9, 2004) (unreported), a case nearly on all fours with Plaintiff's case, the plaintiff owned twenty shares of the defendant company's stock subject to an agreement that required that plaintiff sell the shares back to the defendant upon retirement or termination. *Id.* at *1–2. Plaintiff was terminated and the parties disagreed on the stock value. *Id.* at *1.

The district court held that the plaintiff's ownership of the stock did not qualify as an ERISA plan because "ownership of the stocks was not deferred in any way; it was individualized, immediate, and fully alienable among authorized shareholders." *Id.* at *8. Additionally, although the plaintiff's purchase of the stock "may have been personally intended as retirement security, the company's purpose in arranging the sale of stock … was simply capital accumulation and ownership control." *Id.* The stock plan "was not for the sake of retirement security, though it may have had that incidental effect." *Id.*

Here, Plaintiff alleges that Defendants offered the stock as a means by which employees could invest in their own company. Therefore, these employees had an incentive to increase the profitability and image of their company before it was sold, hopefully leading then to an increased price for their shares of stock. As the *Roderick* court held, however, such a plan is not covered by ERISA.

For these reasons, the Court holds that Plaintiff has failed to state a claim upon which relief can be granted with respect to his ERISA claim.

### C. Discussion: Count IV (Breach of Contract)

Plaintiff alleges in his second amended complaint that Defendants "breached their

18

contract with Inman when they unlawfully terminated" him. (Second Am. Compl. ¶ 70) Plaintiff

stated at oral argument that the unlawful termination violated the contract provision requiring

that Plaintiff only be fired "for cause." Plaintiff has provided the Court with his employment

contract with Defendants, but the contract nowhere mentions a for-cause prerequisite to

termination. Quite simply, Plaintiff has failed to point to any provision of his employment

contract or any provision of law that could support his breach of contract claim. Again, because

the facts as Plaintiff has alleged them belie the possibility of a breach of contract claim, this

claim must be dismissed. *See, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir.

1999); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996); *Labram v. Havel*, 43 F.3d 918, 921 (4th

Cir. 1995); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254–55 (W.D. Va. 2001);

5B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1357 (3d ed. 1997) (collecting

cases).

### D. Discussion: Count V (Civil Conspiracy)

Plaintiff alleges that Defendants conspired to divest him of his stock ownership and

conspired to injure his "professional reputation and business" by firing him — violations, he

says, of Virginia Code §§ 18.2–499, –500.[7]

Plaintiff's professional reputation and stock ownership in his own company, however, are

employment interests, not business interests. A plethora of cases reveal that employment

interests are not covered by the Virginia civil conspiracy statutes. *See, e.g., Andrews v. Ring*, 585

S.E.2d 780, 784 (Va. 2003) (holding that as a matter of law, sections 18.2–499 and 18.2–500 do

not apply to a former school board member who filed a civil conspiracy charge against the local

---

[7] "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of §
18.2-499, may sue therefor and recover three-fold the damages ... and the costs of suit, including a reasonable fee to
plaintiff's counsel[;] ... 'damages' shall include loss of profits." Va. Code Ann. § 18.2-500 (West 2006).

19

prosecutor and county building inspector after the latter two sought criminal charges against

him); *see also Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (stating that the plaintiffs,

mental hospital employees who had spoken out against alleged wrongs committed in their

hospital, had no civil conspiracy claim because such a claim "relates to their employment and

possible injury to their employment reputation" and collecting cases consistently holding that a

cause of action is "afforded [under these statutes] only when malicious conduct is directed at

one's *business*, not one's *person*" (alteration in original)).

Section 18.2–500 "is aimed at conduct which injures a business" and should be

"construed to exclude employment from its scope." *Buschi*, 775 F.2d at 1259. The holding in this

case "followed the unanimous view of federal district courts sitting in Virginia that the state

statute was not meant to supply a remedy for damage to one's employment status or

relationship." *Jordan v. Hudson*, 690 F. Supp. 502, 507 (E.D. Va. 1988) (finding that a demoted

postmaster failed to state a claim for civil conspiracy against three postal employees); *see also*

*Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246 (W.D. Va. 2001) (citing *Buschi* and

*Jordan* in holding that former employee's civil conspiracy claim against former employer could

not withstand defendants' motion to dismiss).

Here, Plaintiff has failed to allege how the alleged conspiracy hurt him in his *business*.

As such, he has failed to state a claim for civil conspiracy.

### E. Discussion: Count VI (Conversion)

Plaintiff next claims that Defendants violated Virginia Code § 8.3A–420, which prohibits

conversion of instruments. That section beings by stating that the common law doctrine of

conversion of personal property also applies to conversion of instruments.[8] The common law

doctrine of conversion, in turn, "is the wrongful assumption or exercise of the right of ownership

over goods or chattels belonging to another in denial of or inconsistent with the owner's rights."

*Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000) (citing *Universal C.I.T. Credit*

*Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956)). A conversion action can be maintained here

only if Plaintiff is "entitled to the immediate possession of the item alleged to have been

wrongfully converted," here, the stock. *See id.* (citing *United Leasing Corp. v. Thrift Ins. Corp.*,

440 S.E.2d 902, 906 (Va. 1994)).

But Plaintiff here makes clear that one of the conditions of his buying the KPP stock was

that he would have to sell it to Defendants should he be terminated. (*See* Second Am. Compl. ¶

43 ("According to [the] employment contract, he is required to sell his ownership ... back to

KPA upon his termination.")) Therefore, even if Defendants have divested Plaintiff of the stock,

Plaintiff has already alleged that Defendants would be entitled to do so. Because such divestment

would not be "wrongful," Plaintiff's claim for conversion must be dismissed.

### F. Discussion: Count VII (Unjust Enrichment)

Finally, Plaintiff claims that Plaintiff conferred benefits on Defendants, including "his

work and effort ..., increasing [Defendants'] profitability, increasing [Defendants'] revenue, and

providing technical and business expertise" (Second Am. Compl. ¶ 93), but that Defendants

"accepted and retained each of the benefits conferred by Inman under such circumstances as to

make it inequitable for [Defendants] to retain the benefit without payment of its value or divest

Inman of his stock ownership in Defendants" (Second Am. Compl. ¶ 96).

---

[8] Whether the stock at issue here is a negotiable instrument (and therefore covered by Va. Code § 8.3A–420) or merely personal property (and therefore covered by common law) is immaterial to the Court's analysis.

Plaintiff's unjust enrichment claim must fail. Unjust enrichment is an implied or quasi-contract remedy that is based on equitable principles, *Kern v. Freed Co.*, 299 S.E.2d 363, 364–65 (Va. 1983), and therefore is inapplicable when an express contract exists between the parties, *see Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) ("The law will not impose an implied contractual relationship upon parties in contravention of an express contract."). Here, Plaintiff states that his employment was governed by an employment contract; clearly the benefits he alleges to have conferred on Defendants are governed by the contract. Plaintiff's unjust enrichment claim will be dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED in an order to follow, but Plaintiff will be given fifteen days within which to amend his second amended complaint with respect to his ERISA claim only. If Plaintiff is unable to amend or chooses not to amend within the time allotted, the Court will grant Defendant's motion with respect to Plaintiff's ERISA claim.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED:       *[signature]*
_____
United States District Judge

*December 28, 2006*
_____
Date