# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

AUG 0 6 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

Dean M. Inman,

*Plaintiff,*

v.

Klöckner Pentaplast of America, Inc.,
et al.,

*Defendants.*

CIVIL ACTION NO. 3:06cv00011

MEMORANDUM OPINION AND
ORDER

JUDGE NORMAN K. MOON

This matter is before the Court on Defendants' joint motion for summary judgment [Docket #95]. Defendants ask the Court to enter summary judgment with respect to Plaintiff's remaining claims under the Age Discrimination in Employment Act because of Plaintiff's inability to offer any direct or circumstantial evidence of age discrimination in his termination. Because Plaintiff is unable to provide sufficient evidence that would allow the Court to conclude that his age played any part in his termination, Defendants' motion for summary judgment will be GRANTED.

## I. BACKGROUND

Plaintiff Dean Inman ("Inman") is a sixty-one year old white male and former Vice President of Technology for Defendant Klöckner Pentaplast of America ("KPA").[1] Inman worked for KPA for seventeen years—hired in 1988 as a Manager in Training and eventually rising to the head of the KPA Technical Department. In that capacity, Inman managed a staff of approximately thirty-

---

[1] Klöckner Pentaplast of America is a Delaware corporation with its principal place of business in Gordonsville, Virginia. Its parent company was located originally in Germany and is affiliated with a larger group of corporations with operations in eleven countries, commonly known as the Klöckner Pentaplast Group ("KPG"). The other defendant, Klöckner Pentaplast Participations, is a Luxembourgian entity formed for the sole purpose of allowing certain managers and officers of KPA to acquire an ownership interest in KPG.

five employees and reported directly to Mike Tubridy ("Tubridy"), the President for KPA's North and South American Operations. Inman also served on KPA's "Steering Team," an executive committee comprised of KPA senior leadership that managed the company.

Defendant Klöckner Pentaplast of America is one of the world's leading producers of films for pharmaceuticals, medical devices, food, electronics, and general purpose thermoform packaging, as well as printing and specialty applications. Its business is highly competitive because of, among other things, an excess of domestic production capacity for its products and Asian competitors trying to capture market share through low prices. In 2001, KPA was purchased by financial investors Cinven and JP Morgan for approximately 827 million dollars. Cinven and JP Morgan intended to reduce costs and increase profits so that they could sell KPA in four to five years.[2] The combination of expectant investors and the competitive economic climate placed increasing pressure on KPA leadership to meet the challenges that lay before it.

Tubridy became President of KPA's North and South American Operations in July 2003.[3] Unlike his predecessors, Tubridy did not have an engineering background, but instead came from KPA's sale and marketing department. Tubridy immediately set forth to implement organizational improvements and performance metrics throughout KPA so that its management could assess and measure the performance of its departments. Tubridy asked Inman to develop an organizational plan to improve the Technology Department and a system of performance metrics to measure the commercial development of the Technology Department, but this request became a source of great tension between the men as Inman resisted these initiatives and subsequent efforts to, among other

---

[2] Cinven and JP Morgan subsequently sold KPA to The Blackstone Group, a private equity firm, for approximately 1.8 billion dollars in May 2007.

[3] Tubridy served as President in a temporary capacity for several months before his official appointment in July 2003.

2

things, develop staff succession plans and to implement wage freezes.

1. Inman Rebuffed Efforts to Develop an Organizational Plan for His Staff

Tubridy expressed concern in 2003 with Inman's team leadership, the "cultural" disconnect of his team, and the lack of peer support and communication within the Technical Department.[4] Tubridy also criticized Inman's dysfunctional allocation of staff responsibilities and his lack of personnel development and succession planning. For that reason, Tubridy directed Inman to work with Mike Yeatts, KPA's Director of Human Resources, to develop a detailed organizational development plan to remedy these deficiencies.

Yeatts presented Inman a proposed development plan for the KPA Technology Department in January of 2004, but Inman dismissed the plan a month later—stating that he "rejected in its entirety the Technical Department Organizational Review Document" and deriding it as "interlaced with inaccuracies and unfounded opinions."[5] Inman stated that he would prepare a "more formal response" because of the potential for "legal problems for Klöckner" despite his disappointment with the "content of the document and the apparent underlying drivers."

Inman did not submit his proposed organizational plan for nearly eight months. Inman sent his suggested changes to the Technical Department to Tubridy on October 3, 2004, and then proceeded to badger Tubridy for almost two weeks to approve the plan. Tubridy refused to approve the plan, however, and questioned Inman's effort—advising that he would not "give [the plan] a

---

[4]It does not appear that Tubridy ever doubted Inman's technical competence or his attention to detail, but his leadership abilities were repeatedly called into question during his 2003 and 2004 annual performance reviews and during the external assessment of KPA management performed by Egon Zehnder International.

[5]Inman later characterized the plan as "very minimal in value, sophomoric in its content, nothing of value" and complained that he "did not understand why someone without the training, apparent training in such issues, would be attempting to provide the information."

3

rubber stamp approval without dialogue" because it was "unclear" if there had been enough "discussion and consensus by the various stakeholders . . . to ensure a good HR plan and org[anizational] structure for your department."[6]

## 2. Inman Felt Management Assessment/Succession Planning Focused on Younger Employees

In November of 2003, KPA hired a firm called Egon Zehnder International ("EZI") to evaluate its leadership team because of its "ambitious growth objectives" and the need to provide "a pipeline of talent" for its staff needs. KPA selected EZI, in part, because of its expertise in evaluating management teams in the context of succession planning and leadership development. EZI consultants met with the KPA management team and other high performers in key positions to assess their strengths and talents. EZI then provided KPA with an assessment of its management capability and provided personalized feedback and professional development advice to each person evaluated.[7]

EZI interviewed Inman on or about March 22, 2004, to assess his strengths, talents, and career development.[8] Tubridy attended this discussion. EZI and Tubridy purportedly informed Inman that he had little potential for advancement at KPA compared to younger engineers[9] and spent

---

[6]Tubridy also advised Inman that his harassment was inappropriate because "constantly resending the same document" wouldn't get an answer any quicker due to the significant changes proposed.

[7]EZI had previously assessed the management capabilities of nine KPA employees, including Tubridy.

[8]Tubridy had specifically identified the need for personnel development and succession planning in Inman's 2003 performance review.

[9]Inman held the third highest position in the company at that time as Vice President of Technology. The only positions at KPA higher in the organizational hierarchy were President and Vice President of Operations.

4

much of the meeting discussing the need for succession and organizational planning for Inman and the rest of his department. In particular, EZI and Tubridy stressed the need to find and develop "new talent" within the company. As a result, Inman left the meeting "feeling very old and unappreciated" because he felt the evaluation was less about what he could personally do to improve and become more valuable to the company, and more about what KPA could do with the younger members of his department to bring them into positions of higher responsibility.[10]

Shortly thereafter, Tubridy directed Yeatts to begin the process of succession planning with Inman. Yeatts explained that the purpose of the planning was to develop and mentor a person to replace Inman eventually;[11] therefore, Yeatts interviewed Inman about the skills that a person would need to have or develop in order to take over his position. During this discussion, Yeatts purportedly told Inman that KPA needed a plan for his successor because he "was getting up there in years." Inman replied, in effect, that the meeting and Yeatts' comment made him feel old and that he had not considered the end of his career at KPA before that point. In response, Yeatts assured Inman that the meeting was intended only to identify an eventual successor for Inman and the rest of his department. Yeatts stressed the importance of having a replacement designated for all members of the Technical Department as this would help KPA plan for training for the members of the department, including Inman.

3. Inman Ignored Efforts to Create Performance Metrics

In May 2003, Tubridy directed Inman to develop a system to measure and report the

_____

[10]EZI did discuss Inman's ineffective leadership style with him, however, and his need as a department lead to manage from a high level rather than micromanaging and getting involved in the minutia of detail.

[11]At the time of the meeting, Inman was fifty-seven years old and did not plan to retire for eight years.

activities and performance of the Technical Department.[12] Inman resisted this effort, however, for over two years while Tubridy continued to ask for a way to assess his department. Tubridy told Inman during his 2003 performance review, for example, to "establish a communication reporting mechanism for his group to keep up with the activities of his team" once he addressed the "organizational design" issues within his team. A year later, Tubridy again directed Inman during his annual review to develop a system to measure the accountability of himself and his team, but this time Tubridy made the metrics a personal goal of Inman for 2004/05. Tubridy provided Inman a rough framework of the type of reports that he wanted and told Inman to work with Chuck DeLanoy ("DeLanoy"), KPA's Vice President of Finance, and Yeatts so that the reports could be finished by the middle of January.

Inman did not meet with DeLanoy or Yeatts as directed, however, and instead looked at the existing reporting systems in place within KPA to determine if any met Tubridy's requirements. Inman decided on his own that the "robust" metrics and reports available to KPA executives, including Tubridy, were sufficient and that there was no need to change. Inman did not inform Tubridy of his decision not to develop the requested metric system or to meet with DeLanoy or Yeatts.

On August 4, 2005, Tubridy called a meeting with Inman, DeLanoy, and Yeatts to discuss his dissatisfaction with the performance of the Technical Department and with Inman's leadership of the department. Tubridy first noted that the Technical Department was deficient in innovations, cost out, process engineering, and the launch of new products, and then turned to the development of performance metrics. Tubridy admonished Inman for fighting the development of metrics "every

---

[12]Tubridy was still acting President of KPA at that time and, therefore, directed Yeatts to ask Inman to develop these performance metrics.

6

step of the way" and questioned if Inman was able to change and develop such a plan.[13]

Inman met with Tubridy, DeLanoy, and Yeatts four days later and presented a document he called the "Total Innovation and Development Program" to address the need for performance metrics. Tubridy scanned the document, but dismissed the report because it still provided no method to measure the resources and utilization of the Technical Department. Tubridy immediately expressed his frustration and purportedly stated that the plan was exactly what he expected from a member of the "old group" and that he wanted "new ideas from new people." Inman claims that he took this statement to imply that he was not part of this group of "new people."

4. Inman Resisted Other Initiatives by the Human Resources Department

In the summer of 2005, Yeatts informed all employees subject to the company's standard confidentiality and non-competition agreement that they needed to sign an updated version of the agreement.[14] Inman had previously signed earlier versions of the agreement with similar protective language, but he objected this time to statements in the sections entitled "Disclosure of

---

[13]Specifically, Tubridy stated:
And then there's measurements for commercial development—you've fought this every step of the way. We must go in a different direction; we must have a change of people.

Do you know how to go about making change?
Do you need to think about it?

There is a difference in the way you think and the way I want you to think. . . .

I need to have confidence in the specific actions you have to take to enable us to register and fulfill objectives. Right now, I don't.

You need to be results oriented vs. an activity checklist. (Defs.' Joint Mot. for Summ. J., Ex. 4.)

[14]Senior level KPA employees are required to sign the company's Confidential Technical and Business Protection Employee Agreement and Non-Competition Covenant as a condition of employment.

Contributions," "Non-Competition Covenant", "Subsequent Employment," "Intention of Parties: Judicial Amendment," "Choice of Law and Forum," "Advice of Counsel," and "Remedies Upon Breach." Yeatts advised Inman that he could no longer work at KPA if he did not sign the updated agreement. He also informed Tubridy of Inman's objections to the agreement.

Inman revised the agreement based on his concerns and sent it to Tubridy on July 15, 2005. Tubridy found the changes to the agreement unacceptable and advised Inman that he must sign the agreement as provided or he would be unable to work at KPA. Tubridy also criticized Inman for requiring his subordinates to sign the original agreement while he asked for changes applicable only for himself. Inman finally signed the original agreement on July 21, 2005, with an addendum of his objections attached.

During this time, Inman also refused to attend mandatory training required by the Human Resources Department. In August 2005, the KPA Human Resources Department began planning for a periodic training session on employment interviews that all senior managers were required to attend. Inman refused to attend these training sessions, however, and derided the training as "non-value added" to Human Resources personnel. Yeatts informed Inman that the training was mandatory and offered several possible training dates that he could attend. Inman again objected to the training to Yeatts and asked sarcastically as to which HR account his time should be charged. Yeatts ultimately told Tubridy of his difficulty in scheduling Inman for this training.

5. Inman Criticized and Undermined Efforts to Reduce Costs

KPA implemented a number of cost reduction initiatives in the fall of 2005 because of an increasingly difficult economic climate. The cost of electricity, healthcare, materials and transportation had increased dramatically, and KPA was unable to pass these costs on to its customers. The cost of PVC resin, for example, had doubled over the last three years, and healthcare

8

costs were forecast to exceed their budget by 1.8 million dollars.[15] Economic conditions began to improve in the spring and summer of 2005, but conditions weakened substantially in the aftermath of Hurricanes Katrina and Rita in August and September of that year. The price of PVC resin immediately shot to 53.50 cents in September 2005, which forced KPA to consider drastic measures to protect against further margin erosion.

As a result, KPA decided to change its health insurance providers and increase employee deductibles, physician co-pays, and prescription drug costs. KPA also implemented a wage freeze to reduce projected salary increases by placing all wage increases on hold for the highest earning twenty percent of employees based on total compensation. These decisions were discussed at length by the Steering Team and supported by all members present at the meetings.[16] Tubridy informed KPA management of the decision to freeze wages at a planned dinner meeting on September 14, 2005, at the Omni Hotel in Charlottesville, Virginia.[17]

Inman did not, however, support the decision to freeze wages and immediately began to criticize it. Bobby Nolan, the Director of Sales, informed Tubridy the next day that Inman had been overheard criticizing it as "demoralizing and unprofessional." Tubridy called a meeting with Inman

---

[15]PVC resin is the largest volume raw material purchased by KPA. Each penny increase in the cost of PVC resin that KPA is unable to pass on to consumers results in a 3.4 million dollar decrease in its annual margins. The cost of PVC resin had increased from 26.77 cents per pound in February of 2002 to 48.77 cents per pound in April 2005.

[16]The changes to the KPA healthcare plan were discussed initially during the April 4, 2005 meeting of the Steering Team and again during the June 27, 2005, and July 11, 2005 meetings. Inman attended all of these meetings and did not object or comment on the plan during these meetings. The wage freeze decision had been discussed previously, but was not implemented until a special meeting of the Steering Team held on September 14, 2005. Inman was not present during this meeting and was not available by phone, but Tubridy informed him of the decision prior to announcing it to the company.

[17]Although Inman was not present during the Steering Team meeting held earlier that day, he was present at the dinner that evening. Tubridy informed Inman of the decision to freeze wages prior to announcing it to all managers and understood Inman to support the decision.

Case 3:06-cv-00011-NKM-BWC   Document 148   Filed 08/06/08   Page 9 of 28   Pageid#: 2474

and asked if he had any concerns regarding the wage freeze since he had not been present at the Steering Team meeting, but Inman stated that he agreed with the decision. Tubridy then asked Inman why he had criticized the decision with his comments. Inman did not deny that he had criticized the decision; instead, he asked who had told Tubridy what he said and assumed that the source was either Yeatts or Charlie Abbey ("Abbey"), a member of the Human Resources Department. Tubridy told Inman that the source was immaterial and that the only thing that mattered was that all of the members of the Steering Team supported the decision to freeze wages. Tubridy also told Inman not to attempt to retaliate against Abbey. Inman agreed to support the wage freeze, but immediately confronted Abbey regarding his meeting with Tubridy despite instructions not to do so.

Inman continued with his critical behavior despite his assurance to Tubridy that he would support the wage freeze. Inman had expressed interest in participating in a proposed new non-qualified retirement plan prior to the announcement of the wage freeze, but expressed his displeasure with the wage freeze and KPA management during a series of emails to Human Resources regarding the plan. On September 21, 2005, Inman wrote in response to an inquiry about his interest in the non-qualified plan:

> No, with the recent announcements of wage freezes and the poor performance of KPA and resulting decreases in total compensation, I will be unable financially to participate. Very unfortunate. If the downhill slide continues for KPA, I guess I will just have to work until I am 75 at this rate or pursue other avenues to pay for retirement.

A week later, Inman wrote a similar email after a reminder that he must enroll by September 30, 2005, if he intended to participate in the non-qualified retirement plan:

> Thanks again for the reminder. As I stated before, I will not be able financially to participate in this program. Klöckner's answer to inflation, the out of control living expenses in the Charlottesville area, increases in interest rates, out of control energy costs and many other out of control negative cash flow problems are the basis of my

10

families' [sic] inability to participate. The answer from KPA to this run up in costs is a series of take-a-way programs that reduces the positive cash flow "total compensation" side of the equation which leads to a result that is tragic. This presentation of the program comes as an insult to my entire family when it arrives at a time when we cannot afford it due these KPA take-a-way programs. Where was this plan when KPA was not in its current down hill slide, compensation was adequate and it would have helped my family to prepare for the future?

Inman sent a third scathing email when he learned that a drug he was taking would require a higher co-pay:

It is not acceptable to me that a medication that has been prescribed to me by my personal physician for my personal health is classified after the fact as the inappropriate medication for me by KPA's new insurance company and therefore I must pay the highest amount for the drug. It has already been proven that I cannot tolerate alternate medications. I will hold the insurance company and KPA responsible for any and all harm that is done to my health and/or any increase in my out of pocket expenses as a result of our new insurance company playing the role of dictating which medications that I should and should not use.

Yeatts informed Tubridy of Inman's emails and Tubridy instructed him to confront Inman and advise that such unprofessional behavior would not be tolerated. Therefore, Yeatts sent an email to Inman on October 18, 2005, and told Inman that "it disappoints me to have received what appears to be yet another monthly installment of your disdain for recent Human Resources initiatives." Yeatts advised Inman that he "object[ed] to the continuation of your attempts to bully your way through the HR staff" and that all "criticisms, complaints, or objections" should be brought to him instead of "caustic emails directed to employees in my department" because "he is responsible for all HR initiatives." Yeatts then reprimanded Inman by stating "[a]s a Vice President, I know you fully understand the challenges facing Klöckner. However, instead of leading and setting an example, you are publicly degrading strategic (albeit difficult) steps the Steering Team, of which you are an important member, is taking to address these challenges."

6. KPA Hired Proudfoot Consulting to Further Reduce Costs and Improve Efficiency

In October 2005, KPA engaged Proudfoot Consulting ("Proudfoot") to help increase its

11

efficiency and reduce its operating expenses.[18]  DeLanoy, Tubridy, and Veasey met with Andreas Paetz ("Paetz") of Proudfoot on October 27, 2005, to discuss Proudfoot's proposed services.  Paetz explained that four internal employees would need to be assigned to the project for approximately six months.  Paetz advised that the employees should be "young," "energetic," "future people" and should see this assignment as a "growth" opportunity.[19]  Paetz did not participate in the selection of the Proudfoot task force, however; Tubridy, DeLanoy, and Veasey alone selected the task force from a list of possible team members suggested by management.[20]  Six employees were selected for the task force with ages ranging from 38 to 59.[21]  KPA planned to begin the Proudfoot initiative in January 2006.

7. Tubridy Fired Inman on December 15, 2005

On December 15, 2005, Tubridy called Inman into his office and terminated his employment with KPA.[22]  The reasons for the termination differ between Inman and Tubridy.  Inman claims that Tubridy stated that Inman did not fit the "profile" or "model" of what KPA needed in a technical

---

[18]Proudfoot had assisted in the installation of a new management operating system at KPA's affiliated company, Klöckner Pentaplast Europe.  KPA intended to implement a similar project called "Fit For Future," or "F³," to reduce costs and make the company more desirable to prospective purchasers.

[19]Paetz subsequently explained that "young" did not mean a person's chronological age, but rather their tenure with the company.  He suggested "young" employees so that the task force could work relatively freely, unencumbered from social or political constraints.

[20]The proposed candidates were selected based on a two page document prepared by a different Proudfoot consultant that outlined the specific task force team criteria.  This document was sent to all KPA managers involved in the selection process and did not mention age as a selection criteria.

[21]Specifically, the task force was comprised of Jennifer Morris, age 45; Tom Bresnahan, age 46; Roy Giglio, age 38; Paul Tompkins, age 59; Johnnie Osborne, age 41; and Kenny Pennington, age 38.

[22]Inman was fifty-eight years old at the time he was terminated.

12

leader and that he wanted KPA to be more focused on financial results and budgets instead of the "same old things" that Inman had provided. Inman also claims that Tubridy stated that KPA needed a leader that would "depict a more energetic person for the appearance of a revitalized company" to lead the Technical Department. Inman inferred from these alleged comments that he did not represent the image that KPA wanted to portray because of his age.

Tubridy, on the other hand, states that the decision to fire Inman was based on his lack of confidence in Inman's leadership and the unprofessional manner in which he conducted himself. Tubridy explained that he did not want Inman to jeopardize the success of the Proudfoot initiative the following year and that he did not feel confident in Inman's support of corporate initiatives following the wage freeze incident. Tubridy claims that he had considered terminating Inman as early as August or September of 2005 and had discussed the move with Tom Goeke, the Chief Operating Officer of KPG and the former President of KPA. Tubridy replaced Inman with forty-five year old David Veasey, the Vice President of Operations.[23]

On March 6, 2006, Inman filed his initial complaint against KPA and KPG for allegedly firing him because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Inman alleged in support that he had direct evidence of discrimination based on (1) Tubridy's purported comments on December 15, 2005, that he did not fit the "model" and "profile" of what KPA needed in a leader and that they needed someone who would "depict a more energetic person for the appearance of a revitalized company;" (2) Tubridy's comments in August of 2005 that his ideas were exactly what he would expect from Inman as part of the "old group" and that he needed "new ideas from new people;" (3) Tubridy's comments in March 2005 that he had

---

[23]This change did not result in a promotion for Veasey as the Vice President of Technology reports to the Vice President of Operations.

13

little room for advancement at KPA when compared to younger engineers and that KPA needed to focus on developing "new talent;" and (4) Yeatts' comment that Inman was "getting up there in years." Inman also brought claims for breach of contract, civil conspiracy, unjust enrichment, grand larceny, embezzlement, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 *et seq.* Inman voluntarily dropped his claims for grand larceny and embezzlement, and the Court dismissed all other claims except for his ADEA claim and his request for a declaratory judgment that he is entitled to retain his KPP shares because of KPA's wrongful termination.

Defendants filed the pending motion for summary judgment on April 29, 2008, and argue that Inman has no direct or circumstantial evidence of discrimination and that he was terminated not because of his age, but because he did not meet the legitimate job expectations of his employer. In support of their motion, Defendants submitted over 300 pages of exhibits to support their nearly 100 pages of legal briefs. Inman argues in response that he has direct evidence of discrimination because of Tubridy and Yeatts' comments and that Defendants are unable to show that Inman would have been terminated but for the discriminatory intent. Inman has similarly submitted over 300 pages of exhibits in support of his motion. A hearing was held on May 22, 2008, regarding the motions, but the parties continued to submit additional evidence because of late discovery involving the Proudfoot task force. The Court finally stayed the trial and all proceedings on June 23, 2008, to have sufficient time to sort through the lengthy motions and voluminous exhibits. The Court has thoroughly examined the evidence and considered the motions and is ready to issue its decision.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a

14

matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The Court does not weigh the evidence or determine the truth of the matter when considering a motion for summary judgment. *Anderson*, 477 U.S. at 249. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party can establish such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324. Summary judgment is appropriate if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The nonmoving party may not rest upon mere allegations, denials of the adverse party's pleading, or mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). If the proffered evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Anderson*, 477 U.S. at 242). Indeed, the trial judge has an affirmative obligation to "prevent 'factually unsupported claims and defenses' from proceeding to trial," *Anderson*, 477 U.S. at 249, and there is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

15

## III. DISCUSSION

The Age Discrimination in Employment Act makes it unlawful for an employer to discharge an employee because of age. 29 U.S.C. § 623(a)(1). The plaintiff in an ADEA case must show by a preponderance of the evidence that their age "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Ruff v. Target Stores, Inc.*, 226 Fed Appx. 294, 300 (4th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)); *see also EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir. 1992) (noting that the plaintiff must show that but for the employer's intent to discriminate on the basis of age, the plaintiff would not have been discharged). A plaintiff's subjective belief that he or she was discharged as a result of age discrimination is insufficient, however, to create an issue for the jury. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (quoting *Elliot v. Group Med. & Surgical Serv.*, 714 F.2d 556, 564 (5th Cir. 1983)). The plaintiff can establish an ADEA claim through two alternative methods of proof: (1) a "mixed-motive" framework in which the plaintiff must show by direct evidence that age was a motivating factor in an adverse employment decision; or (2) a "pretext" framework that employs the *McDonnell Douglas* burden-shifting analysis used in Title VII cases. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). Regardless of the method used, the ultimate question is whether the plaintiff was a victim of intentional discrimination because of a protected trait (*i.e.*, age). *Id.* at 286.

### A. Inman Has Failed to Show that KPA Acted Because of His Age

In a mixed-motive analysis, the plaintiff may establish discrimination by "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision. *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 163 (4th Cir. 2004) (citation omitted). The plaintiff does not have to show that discrimination was

16

the sole motivating factor, only that it was a motivating factor. *Hill*, 354 F.3d at 284. Thus, a plaintiff need only demonstrate that the employer acted because of both permissible and forbidden reasons. *Warfield-Rohr Casket Co.*, 364 F.3d at 164. The purported discrimination must be supported by direct evidence, not circumstantial, but it does not have to be corroborated.[24] *Id.* (noting that plaintiff's testimony does not have to be corroborated to apply the mixed-motive framework because corroboration, or the lack thereof, relates only to credibility and the weight of the evidence, which are issues for a jury). An employer may avoid liability even if the plaintiff is able to show that the adverse employment action was motivated in part because of age if it can prove that the employee would have been fired even in the absence of the discriminatory motive. *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989)).

In this case, Inman argues that he has direct evidence of discrimination and/or animus because of his age based on five different statements made by Tubridy, Yeatts, and Paetz. Specifically, Inman argues that their comments about needing "new talent," that his ideas reflected being part of the "old group," and that he did not fit the "model" and "profile" that KPA needed indicate their animus toward his age. These types of statements may well constitute direct evidence of discrimination, but such comments must be considered in the context in which they were made to determine if they indicate a discriminatory intent. *Mereish v. Walker*, 359 F.3d 330, 337 (4th Cir. 2004). Therefore, statements must be "related to the employment decision in question," and not isolated or stray remarks, to establish direct evidence of discrimination. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999); *O'Connor v. Consol. Coin Caterers Corp.*, 56

---

[24]The Supreme Court has held that direct evidence is not required to apply the mixed-motive framework in Title VII cases and that a plaintiff can rely on circumstantial evidence in such cases. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–99 (2003). The Fourth Circuit has assumed without deciding, however, that direct evidence is still required for a mixed-motive analysis in an ADEA case. *Hill*, 354 F.3d at 285 n.2.

F.3d 542, 549 (4th Cir. 1995) (noting that there must be a "nexus between the alleged discriminatory statements and *any* of the employment decisions made by the employer" for remarks to be considered evidence of a discriminatory discharge) (emphasis in original).

### 1. Statements by EZI, Tubridy, and Yeatts Reference Process of Generational Change

First, the statements by EZI, Tubridy, and Yeatts that Inman had little potential for advancement when compared with younger engineers, that KPA was focused on developing "new talent," and that Inman was "getting up there in years" were all made in the context of succession planning and personnel development and therefore do not create triable issues of age discrimination.[25] *Mereish*, 359 F.3d at 337 ("[W]e have consistently held, along with other circuits, that general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination."). The statement by EZI and/or Tubridy that Inman had little potential for advancement compared to younger engineers was literally true—Inman was the third highest ranking corporate officer at KPA and only Tubridy, the President of KPA, and Veasey, the Vice President of Operations, held positions higher in the corporate hierarchy. In addition, EZI and Tubridy focused on the need to develop "new talent" because EZI had been hired, in part, for its expertise in succession planning. Tubridy had even identified "personnel development & succession planning" as an opportunity for improvement in Inman's 2003 performance evaluation. Moreover, Inman's personal belief alone that this meeting left him "feeling old and unappreciated" because the meeting focused less on what he could do to become more "valuable" to the company and "more about what KPA could do to bring younger members of the department into positions of higher responsibility" is insufficient to create an issue for the jury, particularly considering that Inman was

---

[25]The Court will assume for the purpose of this motion that these statements actually occurred despite Defendants' assertions to the contrary.

already extremely valuable to KPA as the head of its Technical Department and the third highest ranking officer in the company. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (finding that "[w]hile a Title VII plaintiff may present direct . . . evidence to support [his] claim of discrimination, unsupported speculation is insufficient."). As a result, it is difficult to see how these statements have any probative value as to the issue of discriminatory intent on the part of Tubridy or EZI and, to the extent they do, the statements clearly refer to the process of generational change. *See, e.g.*, *Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994) (finding statement that "there comes a time when we have to make way for younger people" a "truism" that merely reflects a fact of life); *Clay Printing Co.*, 955 F.2d at 942 (finding remark that company needed "to attract newer, younger people" and "young blood" to be insufficient evidence of age bias because they referenced the need for generational change in business life).[26]

Similarly, Yeatts's statement that Inman was "getting up there in years" was made in the context of a succession planning meeting for the entire Technical Department and did not reflect any discriminatory intent. Yeatts explained to Inman in the meeting that all members of the department needed to have an eventual replacement designated so that KPA could plan for their training and career development and also to prepare for contingencies. The fact that Inman felt sad or old by Yeatts' comment regarding his impending retirement has no bearing on whether it showed an intent to discriminate. Further, the statement alone does not suggest any animus given the context in which it was made. Yeatts merely referred to Inman's age to emphasize the need to designate and train an eventual successor, but there is no indication that this process would occur soon. Accordingly, this statement again reflects the process of generational change and the need for a corporation to plan

---

[26]Further, the statements were made nine months before Inman was discharged, making it dubious that they had any influence on the decision to terminate him because of the lack of temporal proximity.

for the future and does not create a triable issue of age discrimination for a jury.[27] *See, e.g., Mereish,* 359 F.3d at 337 (explaining that statements referring to the process of generational change do not establish an intent to discriminate on the basis of age).

### 2. Statement by Tubridy Reflects Frustration in Inability to Innovate

Second, Tubridy's comments in August of 2005 that Inman's ideas were exactly what he would expect from part of the "old group" and that he needed "new ideas from new people" do not reflect an intent to discriminate; instead, the context of the statement shows that Tubridy was frustrated with Inman's resistance and inability to create a reporting system to account for the performance of the Technical Department. Tubridy had asked Inman for over two years to provide a system of performance metrics so that he could measure the commercial development of the Technical Department and even provided a rough framework of the type of system he wanted during Inman's 2004 performance review.[28] Inman ignored Tubridy's directive, however, because he decided that the existing reports were sufficient and therefore did not need to be changed, but did not inform Tubridy of this decision. Inman did not attempt to comply with Tubridy's request until Tubridy publicly expressed his displeasure with Inman and the performance of the Technical Department as a whole. At that time, Tubridy explained that Inman did not "think the way [he]

---

[27]Moreover, Inman has not shown that Yeatts had any involvement in the decision to terminate him on December 15, 2005, which is required for this statement to provide direct evidence of discrimination. *See Price Waterhouse*, 490 U.S. at 277 (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's burden" of proving discrimination); *Hill*, 354 F.3d at 286 (same).

[28]Tubridy first asked Yeatts to discuss the need for new metrics with Inman in May 2003, and then personally directed Inman to develop the requested metrics in his 2003 performance review. Inman did not comply with the request; therefore, Tubridy again told Inman during his 2004 performance review to create a way to measure the results of the Technical Department. This time, Tubridy provided a rough framework of the type of system he wanted and directed Inman to finalize the system with Yeatts and DeLanoy by the middle of January 2005.

20

wanted [him] to think" and asked if Inman was capable of change. Inman finally provided a proposed report four days later, but it still did not provide a way to measure the resources and utilization of the Technical Department as requested. It was in this context that Tubridy stated that the report was what he expected as part of the "old group" and that "new ideas from new people" were needed. The context of these comments clearly establish that Tubridy was not referring to Inman's age, but his inability to perform and innovate. A statement regarding an employee's inability to perform as directed could apply to an employee of any age, just as a comment about an employee's approach to work or problem-solving reflects on their performance and not their age. *See Knox v. First Nat'l Bank of Chicago*, No. 93-C-2005, 1996 WL 197553, at *2 (N.D. Ill. Apr. 18, 1996) (finding that comment about an "old bank/new bank mentality" does not prove a discriminatory bias against an employee's age because statements about an employee's performance apply to all employees regardless of age). The fact that Inman subjectively took this statement to mean that he was "an old person" with "old ideas" and not capable of "taking [KPA] into this new level of innovation" alone does not establish a discriminatory intent. *Williams*, 871 F.2d at 459. The question of whether Inman is capable of producing new ideas is a testament solely to his personal capabilities as young people are hardly the only source of innovation. Accordingly, Tubridy's statements in August 2005 do not show an intent to discriminate on the basis of age. *See Lind v. UNC, Inc.*, 36 F. Supp. 2d 350, 358 (N.D. Tex. 1999) (finding that statement that employer was "looking for new ideas" referred to ideas, not a person's age, and "strain[ed] credulity [to] suggest[] that this testimony evidence[d] age discrimination").

   *3. Request for "Young" and "Energetic" Employees Was Not Made by Decisionmaker*

   Third, the request by Paetz for "young," "energetic" employees and "future people" also cannot be considered evidence of an intent to discriminate because it was, at worst, a stray remark

21

with an insufficient nexus to the adverse employment decision and, at best, a reference to employee tenure and not their age. Paetz met with Tubridy, DeLanoy, and Veasey on October 27, 2005, to discuss a proposal for Proudfoot's consulting services and advised that Proudfoot would need four KPA employees—employees that were "young," "energetic," and "future people"—to assist them in their endeavor. This remark is not probative evidence of an intent to discriminate, however, given that it was made by a nondecisionmaker and had no temporal proximity to the adverse employment decision. *Roberts v. Wal-Mart Stores, Inc.*, No. 95-0059-H, 1997 WL 38138, at *3 (W.D. Va. Jan. 28, 1997) ("Stray remarks by persons not involved in the employment decision-making process are not material to a finding of discrimination unless those remarks are made to the decision-makers and have *some* impact on the process.") (emphasis added); *see also Price Waterhouse*, 490 U.S. at 277. Moreover, Paetz did not participate in the selection of the Proudfoot task force and the employees selected for the team ranged in age from 38 to 59. Therefore, the fact that Inman was not selected for the task force suggests that KPA did not adopt or apply his remark and makes his remark not probative of an intent to discriminate. *Curry v. E-Systems, Inc.*, 72 F.3d 126, 1995 WL 729512, at *5 (4th Cir. 1995) (unpublished) ("Remarks of outsiders to the decisional process that reflect only their personal beliefs and opinions are not relevant to the issue of the decisionmaker's motive.").

Further, Paetz has explained that he referred to an employee's tenure with KPA, not their age, when he asked for "young" employees because he wanted the task force members to be free to act without social or political constraints. Certainly, a reference to an employee's length of employment with a company is not indicative of discrimination as a employee can be newly hired at age forty just as easily as age twenty or thirty. Moreover, English is not Paetz's native language, and he may have misspoken from his native German in trying to convey his request. Regardless, Inman has failed to show any link between Paetz's suggested criteria for the selection of the task

22

force and the decision to terminate Inman. As a result, even if Paetz's comment was indicative of an intent to discriminate, the failure to show a temporal proximity or causal connection between the comment and the decision to terminate Inman makes this a stray remark and not probative of Inman's claim for age discrimination. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (noting that statements that reflect a discriminatory attitude, but lack a nexus with the adverse employment action do not constitute direct evidence of age discrimination).

### 4. Remarks That Inman Did Not Fit "Model" or "Profile" Were Age Neutral

Last, the remarks made by Tubridy when he terminated Inman—that Inman did not fit the "model" or profile" of a technical leader and that Tubridy wanted a leader that would "depict a more energetic person for the appearance of a revitalized company"—cannot be considered direct evidence of age discrimination because the statements refer to characteristics unrelated to a person's age. The reference to Inman not fitting the "model" or "profile" of a technical leader by itself does not suggest a discriminatory animus in light of Tubridy's issues with Inman's job performance. The words "model" and "profile," taken in the context of Inman's inappropriate behavior and unacceptable job behavior, likely meant that Inman did not meet Turbridy's expectations of the ideal leader of the Technical Department. *See, e.g., Webster's Third New Int'l Dictionary* 1451 (1976) (defining "model" as "a person or thing regarded as worthy of imitation" and "a person or thing that serves as a pattern or source of inspiration"). A reasonable jury could arrive at no other interpretation given Tubridy's issues with Inman over the last two years: his refusal to do as directed, his inability to manage effectively, and his tendency to bully and harass coworkers. Moreover, the fact that Tubridy discussed firing Inman with Veasey four months earlier supports this interpretation.

Similarly, the remark about needing a "more energetic person" to reflect "a revitalized

23

company" does not indicate a discriminatory animus. A person can be energetic at age sixty just the same as age twenty; the fact that a characteristic is linked to a stereotype—the assumption that older people are not as energetic as youthful persons—does not mean that a person cannot consider that characteristic independent of the stereotype. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1036 (11th Cir. 2000) ("Just because a sought after trait is linked by stereotype to an impermissible consideration does not mean an employer cannot search for an consider the trait itself independently from the stereotype."). Further, KPA was in the midst of preparations to sell the company; thus, a "revitalized company" could have referred to the image of the corporation itself, not its employees—a company rejuvenated through its sale and new ownership. By themselves, these remarks could be directed to anyone, whether young or old. The fact that a lack of energy or vitality is attributed to older people alone does not mean that age discrimination is at hand. *Cf. Cuntz v. La. Health Servs. & Indem. Co.*, No. 96-3511, 1997 WL 582813, at *3 (Sept. 17, 1997 E.D. La.) (noting that a lack of energy or vitality is a trait stereotypical of older people). Because Inman has no other direct evidence, or circumstantial evidence for that matter, of discrimination, the Court finds that Tubridy's remarks viewed in the totality of the circumstances do not reflect an intent to discriminate given the context in which they were made and in light of Inman's performance issues over the previous two years. Accordingly, Inman has failed to establish discrimination under the mixed-motive framework.

 *5. Even If Tubridy's Remarks Were Discriminatory, Inman Would Have Been Terminated*

 Moreover, the Court finds that even if Inman were able to establish an impermissible bias on the part of Tubridy and/or KPA, it is clear that he would have been terminated in the absence of this discriminatory motive and, therefore, Defendants cannot be held liable. *Warfield-Rohr Casket Co.*, 364 F.3d at 164; *see also Price Waterhouse*, 490 U.S. at 276–77 ("The employer need not

isolate the sole cause for the decision; rather it must demonstrate that with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same employment action."). The record is quite clear that Inman had engaged in a pattern and practice of obstinate, bullying behavior for some time and had otherwise failed to meet the legitimate expectations of his employer. Inman was obviously very talented in terms of his technical abilities, but he lacked the leadership skills required by Tubridy and Veasey based on his "disfunctional [sic] allocation" and "cultural disconnect" of his staff, his lack of personnel development, and his refusal to develop a system of accountability for himself or his department.[29] The fact that Inman had been publically praised for his technical achievements even as recently as a week before his dismissal does not discount the fact that he otherwise did not meet his employer's expectations. *See Brinkley*, 180 F.3d at 609–10 (finding that evidence that plaintiff was praised in some aspects of her job did not establish that she met her employer's legitimate job expectations). And the fact that Inman believed he had been meeting Tubridy's expectations, or that Inman's prior supervisor, Tom Goeke, would have done things differently or would not have fired Inman, is irrelevant because it is not probative of whether Inman met Tubridy's legitimate expectations at the time he was fired. *See Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (declaring plaintiff's opinion of her own performance irrelevant because "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" and finding the opinions of her coworkers to be similarly "close to irrelevant"). Even when viewed in the light most favorable to Inman, the Court is left with the unmistakable conclusion that no reasonable jury could find that he was meeting Tubridy or KPA's legitimate job expectations and that he would have fired in the absence of any discriminatory

---

[29]Moreover, Inman lashed out at members of human resources for decisions approved by the Steering Team, a committee of which he himself was a member.

25

animus.[30]  Accordingly, Defendants cannot be held liable for age discrimination under the mixed-motive framework. *Warfield-Rohr Casket Co.*, 364 F.3d at 164.

### B. Inman Is Unable to Make a Prima Facie Case of Pretext

The other method to establish a ADEA claim is under the "pretext" framework made famous in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), in which a plaintiff demonstrates than an employer's purported reason for making an adverse employment action is actually a pretext for discrimination. *Hill*, 354 F.3d at 285. The plaintiff must satisfy four elements to establish a prima facie case of discrimination: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the job and met his employer's legitimate expectations at the time of the adverse employment action; and (4) he was replaced by a substantially younger individual with comparable qualifications. *Warch*, 435 F.3d at 513; *Hill*, 354 F.3d at 285. If a prima facie case is established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination. *Warch*, 435 F.3d at 513. If the employer meets this burden, however, the presumption of discrimination created by the prima facie case disappears from the case and the plaintiff must prove that the proffered justification is pretextual and not the true reasons for the dismissal. *Mereish*, 359 F.3d at 334.

Here, Inman has failed to establish a prima facie case of pretext because he has satisfied only

_____

[30]The Court makes this finding without considering whether Inman did or did not lie about undermining the wage freeze in September of 2005. Regardless of whether he criticized the wage freeze or confronted Abbey, Inman had already failed to meet expectations because of his stubborn refusal to develop performance metrics for his department and his repeated confrontations with KPA personnel (*i.e.*, the issues with the confidentiality/non-compete agreement, the change in health insurance, the nonqualified retirement plan). Tubridy called the August 4, 2005 meeting to express his displeasure with the Technical Department and listed a number of deficiencies within the department. At that time, Tubridy asked Inman if he was capable of changing the way he thinks (*i.e.*, results oriented) or if he needed to change personnel. Thus, this meeting shows that Inman was not meeting the expectations of his employer and that Tubridy had already questioned whether a change in leadership was needed.

three of the four required elements. First, Inman was a member of a protected class because he was over the age of forty at the time of the adverse employment action. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (noting that the ADEA prohibits discrimination against employees because of their age, but limits this protection to individuals at least forty years of age). Second, Inman suffered an adverse employment action because he was fired on December 15, 2005. Third, Inman was replaced by a person substantially younger than him—Veasey was forty-five years old at the time, thirteen years younger than Inman. *See DeBoard v. Washington County School Bd.*, 340 F. Supp. 2d 710, 714–15 (W.D. Va. 2004) (surveying cases within the Fourth Circuit and other circuits and finding that an age difference of ten or more years is generally considered substantial for purposes of the "substantially younger" prong). Inman has not shown, however, that he met the legitimate expectations of his employer for the reasons stated above (*i.e.*, he ineffectively led the Technical Department and did not perform as required by his supervisor). Accordingly, the Court finds that Inman has failed to establish a prima facie case because he is unable to show that the stated reasons for his termination were pretextual. Thus, the Court will grant Defendants' motion for summary judgment as to Inman's claim under the ADEA.

### C. Inman Has Not Shown that He was Wrongfully Terminated

Inman also seeks declaratory relief in his third cause of action, alleging that Defendants wrongfully terminated his employment because of his age and to avoid providing him with the benefits associated with stock ownership. Inman has not provided any other evidence that Defendants terminated him because of his age or for any other wrongful reason. Instead, he relies exclusively on his claim for wrongful termination under the ADEA. This claim fails, however, for the reasons previously stated—the lack of direct evidence of discriminatory intent or that the stated reasons for his termination were pretextual. Further, Inman concedes that he would have to sell his

27

KPP stock back to the company in the event of his lawful termination. Because Inman has not shown that his termination was wrongful or unlawful, the Court cannot find that Defendants attempted to avoid providing him the benefits associated with KPP stock ownership. Accordingly, the Court will grant summary judgment for Defendants in this claim.

## IV. CONCLUSION

For the reasons stated herein, the Court finds no reasonable jury could conclude that age played any factor in Plaintiff's termination. Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiff's ADEA claim and his claim for declaratory relief.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record.

Entered this 6th day of August, 2008

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

28